PAULINE B. COSTELLO, RESPONDENT, v. SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD, A CORPORATION, APPELLANT.—162 S. W. (2d) 322.

Kansas City Court of Appeals.   May 4, 1942.

*Rainey T. Wells* and *Harding, Murphy & Tucker* for appellant.

1104

*Joseph S. Levy* and *Trusty, Pugh, Green & Trusty,* by *S. L. Trusty* for respondent.

SHAIN, P. J.—In this action the plaintiff seeks to recover from defendant for alleged accidental death of her husband to whom the defendant issued a policy of insurance.

The issues in this action will be clarified by a brief statement of facts gleaned from the record and briefs filed herein. The policy involved was issued to Ambrosia B. Costello, husband of plaintiff, dated as effective February 1, 1927. The plaintiff herein is designated as beneficiary. The contract of insurance provided payment of $1000 to beneficiary upon satisfactory proof of death of the insured.

There was a further provision as follows:

"The Association will pay Two Thousand Dollars, less any indebtedness to the Association hereon, in lieu of the face amount of said certificate, upon receipt of due proof that the death of the member resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means and within sixty days after sustaining such injury."

It appears that the insured died suddenly on January 19, 1936. The coroner was called and autopsy was had. The autopsy report is in words and figures as follows:

"Coroner's Case No. 3463

"Bruce A. Costello
"2036 Elmwood
"Kansas City, Mo.

"Age—40          White          Male

"Height—5'7"     Weight—165     Hair black,     Eyes brown,
"Comp. medium.

"DATE OF DEATH .......... January 19, 1936.  2:45 P. M.
"Home. Post Mortem ......... January 19, 1936.  6:00 P. M.

"Tigerman's.

"MAIN GROSS FINDINGS—The body is that of a fairly well nourished, normally developed male, apparently 40 years of age. He shows on general inspection no external evidence of violence. The usual incision for examination of the abdomen and thorax reveals on opening the peritoneal cavity that the organ relationships are normal and the surfaces are smooth and thorax reveals on opening the peritoneal cavity that the organ relationships are normal and the surfaces are smooth, moist and glistening. On opening the chest cavity the pleural surfaces are smooth, moist and glistening, and either lung on removing weights approximately 500 grams. There is nothing worthy of special note seen in either lung. They crepitate throughout, and the bronchi are clear.

"On opening the pericardial sac, the pericardial surfaces are smooth, moist and glistening. The heart weighs approximately 335 grams, it shows the coronary vessels clear and the myocardium on cut section shows nothing worthy of special note. The chamber of the ventricle is normal in size, and no valvular leison is present. The nyocardium on cut section also shows no evidence of degenerative or inflammatory pathology.

"The liver, spleen, pancreas and adrenals on gross external observation and cross-section inspection show nothing worthy of special note. The gall bladder and biliary passages are negative.

"The kidneys weigh on either side approximately 140 grams, the capsule is readily stripped and on cut section the cortical and medullary structures are distinct. The ureters, bladder and prostate are grossly negative.

"The gastro-intestinal tract shows nothing of special note as concerns the stomach, which is empty and the nucous membrane of which shows no evidence of inflammation or irritation. The duodenum, jejunum, small intestine show nothing worthy of special note. The large intestine is also negative.

"Examination of the bladder reveals that it is devoid of urine.

"Further examination reveals that on opening the head, the scalp and calvarium are normal. On incision of the dura it is found that there is an extensive increase in fluid in the lepto-meninges and that the brain on cut section shows a diffuse cerebral edema. No evidence of active degeneration of the brain or evidence of hemorrhage, however, can be seen on multiple cut section through the brain, neither is there evidence of positive pathology at the base of the skull. There is no evidence of fracture of the skeletal structures. This examination is unusual in that we are confronted with an acute cerebral edema in which no definite cause can be found on gross examination.

"GROSS ANATOMICAL DIAGNOSIS—Acute cerebral edema (cause undetermined).

"This is a true copy of the post mortem report in the case of Bruce A. Costello, 2036 Elmwood, Kansas City, Mo.

"(Signed)          "C. G. LEITCH,
                   "C. G. LEITCH, M. D.
                   "Coroner, Jackson County, Mo."

A certified copy of the death record was introduced by plaintiff. The copy contained medical certificate as follows:

"20.  DATE OF DEATH: Month January day 19 year 1936 hour 2 40 minute P. M.

"21.  I hereby certify that I attended the deceased from...........
Deputy Coroner, 19......to......19......; and that death occurred on the date and hour stated above.

"Immediate cause of death                Duration
"Due to......................
"Due to......................
"Other conditions...............
"(Include pregnancy within 3 months of death)
"Major findings:      Of operations............
"Of Autopsy           Yes
"Physician, Underline the cause to which death should be charged statistically.

"22.  If death was due to external causes, fill in the following:

     "(a)  Accident, suicide, or homicide (specify)
     "(b)  Date of occurrence............
     "(c)  Where did injury occur?
           "(City or town)    (County)    (State)
     "(d)  Did injury occur in or about home, on farm, in industrial place, in public place?
           "While at work?  (e)  Means of injury............

"23.  Signature C. J. Leitch (M. D. or other) M. D.
      "Address Kansas City, Missouri
      "Date signed....................."

This certificate was duly certified by Director of Health and Registrar under date of June, 1941.

There appears in the record proofs of death sworn to by plaintiff under date of February 21, 1936. In said proof the following appears:

"The undersigned, being first duly sworn on oath states that Ambrosia Bruce Costello, (Give full name of deceased) who held beneficiary certificate No. RT-979882-L, dated February 27, 1930, died at Kansas City, County of Jackson, State of Missouri, on the 19th day of January, 1936, the cause of his death being accidental injury head caused by fall; and the undersigned hereby make claim for

benefits in such sum as may be due and payable under said certificate.''

In said proof the following also appears:

''When did you first notice or learn of any sign or symptom of failing health in the deceased? None.''

It appears that the defendant, on February 26, 1936, sent to the plaintiff a check for the full amount of the coverage due for natural death. Said check had endorsement on back as follows:

''In consideration of the check on the reverse side hereof, I the undersigned payee hereby acknowledge receipt of payment in full of all benefits due or arising under the certificate described in said check and accept the same in full of all demands against the Sovereign Camp Woodmen of the World. My endorsement of said check is an acknowledgement of this receipt.''

It appears that on April 24, 1936, the plaintiff filed suit on the insurance policy in issue. It appears that plaintiff's petition, when filed, was for the total sum of $2000. In other words, petition alleged death from accidental means, to-wit: ''Violent blow on the head.''

It appears that thereafter the plaintiff endorsed and cashed the check of February 26, 1936, and thereafter amended her petition by giving credit for $1000, and asking for the additional sum of $1000, and alleging that death was the result of accidental, violent and external means, ''a fall causing a brain condition and acute cerebral edema and death.''

The plaintiff's petition alleged all prerequisites to a recovery under the provisions of the policy and the defendant filed answer denying death was by accidental means and further alleged, based upon endorsing and cashing check of February 26, 1936, accord and satisfaction. Defendant further alleged *bona fide* dispute. Plaintiff by way of reply controverted allegations of facts in answer.

Trial was to jury and jury verdict was for plaintiff in the sum of $1290. Judgment was in accordance with verdict and from said judgment defendant duly appealed.

The defendant among other things makes claim that:

''The court erred by refusing to give the instruction in the nature of a demurrer offered by defendant at the close of the whole case for the reason

''(a) The plea of accord and satisfaction had been sustained.

''(b) Plaintiff had entered into a *bona fide* settlement of her claim which was binding upon her.

''(c) There was no evidence to support plaintiff's claim of accidental death.''

Defendant's sub-section (c), if sustained, would dispose of the case. The plaintiff has the burden. However, as jury verdict was for plaintiff, she is entitled to the most favorable inference from all of the testimony.

Plaintiff's statement in her proof of death, set forth, *supra*, is of course a self serving statement which has no probative value from

which inference can be drawn that death was caused by "accidental means."

Plaintiff alleges insured's injury as the result of a fall. The only evidence as to any fall is found in the testimony alone of the plaintiff. When plaintiff was called as a witness she, on direct examination, testified as to the good physical condition of her deceased husband prior to a few days before his death. The witness testified as to events about two days before her husband's death.

The following questions and answers appear:

"Q. Now, was there something the matter with you that Friday? A. Yes, sir, I was suffering from ulcerated teeth and I had had all my teeth pulled, up above.

"Q. And I believe you told me you were lying in bed? A. Yes, sir.

"Q. What time did he come home A. About 6:15 in the evening.

"Q. Was that about the usual time? A. Yes, sir.

"Q. Now just before he came in the house did you hear any noise outside?

"Mr. Murphy: That is objected to as being leading and suggestive.

"Q. (By Mr. Trusty) Well, did you hear anything outside? A. A sound. Thud like.

"Q. Where was that sound or thud like? A. It was outside the door on the porch, is the way it sounded.

"Q. Do you know whether it was icy then or not? A. Yes, sir, it was very icy.

"Q. When you heard the thud did he come in the house? A. Not right away. In just a few minutes."

Thereafter the witness testified to the effect that her husband had brought in groceries and set them on the table and that she noticed that the eggs were broken and that some eggs were smeared on his overcoat.

The following question and answer appears:

"Q. As soon as he walked from there to where he got to you you asked him something, did you? A. Yes, sir.

"Q. What was his answer? A. I said, 'What happened?' and he said, 'I just had a hard fall.'"

The above is the only testimony in the record as to any fall. As to same, we conclude that same does not constitute substantial evidence from which it can be reasonably inferred that insured's death was the result of a "fall causing a brain condition and acute cerebral edema and death."

The plaintiff testified as to her husband's conduct from and after Friday, which tends to prove that he was not feeling as well as usual. However, on cross-examination plaintiff was asked specific questions and gave answers as follows:

"Q. And you recall he didn't make any complaints of having been injured that evening don't you? A. Only he said, 'Had a hard fall.'

"Q. Did he complain at all to you of having been bruised or hurt in any way? A. He didn't show me any marks.

"Q. No, and he didn't complain that he was hurt? A. That was usual with him, because he didn't want me to worry about him.

"Q. I am just asking you. He did or didn't? Which was it? A. He did not.

"Q. He did not. Now you say you both stayed home Friday night? A. Yes, sir."

The following questions and answers also appear:

"Q. And he didn't make any complaints to you Saturday morning before he went to work as to having suffered any injury, did he? A. He didn't say a word. He didn't say anything.

"Q. He didn't point out any bruises or marks on his body or head to you Saturday morning? A. He didn't say anything.

"Q. And you didn't see any? A. No.

"Q. He stayed at work all day Saturday and came home. I believe you stated at his usual time? A. Yes.

"Q. (By Mr. Murphy) Saturday evening you saw him when he came into the house? A. Yes, sir.

"Q. And at that time when he came in he did not complain to you of feeling ill or feeling badly, did he? A. No.

"Q. He didn't complain to you of having sustained any injury? A. He didn't say anything about his condition."

Plaintiff testified that after breakfast Sunday morning her husband became sick at the stomach and vomited. Concerning the incident, the following question and answer appears:

"Q. So then it was not until Sunday sometime after breakfast that you actually noticed anything wrong with your husband or heard a complaint from him? Isn't that a fact? A. Yes, that is a fact."

After a careful reading of plaintiff's testimony, we conclude that there is no evidence given by her from which it can be reasonably inferred that her husband, the insured, died as a result of bodily injury.

There was medical testimony to the effect that cerebral edema could result from a fall. Such, however, is not such evidence from which it can be reasonably inferred that the insured's cerebral edema resulted from a fall. There were quite a number of witnesses who testified in the case. We have searched the record and outside of the testimony given by the plaintiff, supra, we find no oral testimony throwing any light on the question of accidental cause of death of the insured. Further, there is nothing in the medical certificate or autopsy report from which accidental death can be concluded.

The counsel for plaintiff herein, based upon deductive reasoning by the method of elimination, has evolved and stated conclusions that emulate the renowned Sherlock Holmes.

Plaintiff's counsel discourses in his brief as follows:
"Death, Autopsy and Report Thereof."

"Death of the insured occurred January 19, 1936, at 2:45 P. M. He had just sat down on a daybed and his son heard three loud groans, sounded like a snore, and the mother heard it in the kitchen, and he slumped over and was dead.

"A post-mortem was made the same day at 6 P. M., three hours and fifteen minutes after his death. This post-mortem showed that this man was not afflicted or suffering with any disease of any kind and eliminated all diseases and concluded with:

" 'This examination is unusual, in that we are confronted with acute cerebral edema in which no definite cause can be found on gross examination.'

"Then follows the statement, 'Gross Anatomical Diagnosis—Acute Cerebral Edema (cause undetermined.)'

"This autopsy disclosed that there was no disease of any kind or character existing to cause the 'acute cerebral edema.' The cause of death was fixed as 'acute cerebral edema,' but the cause of the 'acute cerebral edema' was undetermined. But all diseases as a cause were elimination by the facts stated therein."

The above deductions are principally based upon the autopsy report made by Dr. Leitch, the coroner. Dr. Leitch was called as a witness by defendant and the autopsy report, *supra*, was identified by him and introduced in evidence. Dr. Leitch's testimony is to the effect that the autopsy report was based upon a gross post mortem examination and further that same was by the naked eye. In the course of direct examination, the doctor was called upon to state, from the facts found in his autopsy report, as to whether actual cause of death could be determined.

The answer of the doctor appears as follows:

"A. Well, based upon those facts as they are detailed in that statement and considering also the post mortem findings as they are evidenced in that gross post mortem examination, I think that further observation would have to be made in order to definitely arrive at the cause of this man's death. In other words, I don't think that those statements or assumptions of facts, coupled with the post mortem facts as I observed them on gross post mortem examination could be interpreted otherwise than that the man died of acute pulmonary edema and that without further opportunity to examine—further opportunity of examination the cause of it could not be determined.

"Q. By that you mean further examination of the organisms of the body? A. Yes.

"Q. By miscrospic slide sections? A. I think one might gather further information if one had the opportunity of making microscopic examinations on some of the tissues of the body, either the brain or the heart."

From a careful study of the record, we conclude that the deductive elimination, *supra,* does not justify plaintiff's counsel's conclusion to the effect that the insured met his death by reason of a "fall causing a brain condition and acute cerebral edema and death."

The evidence in this case discloses that cerebral edema results from many causes, most frequently internal. We conclude there is no evidence shown in the record herein from which it can be reasonably inferred as to what caused the cerebral edema discovered in the autopsy involved herein.

We, therefore, conclude that there is no evidence in the record herein to support the verdict of the jury.

The appealing defendant makes eleven assignments of error. With the exception as to a contention of accord and satisfaction, all the assignments go to the question as to whether there was an issue of fact for the jury.

The defendant admits that it owed plaintiff the amount of the check tendered and cashed. Accord and satisfaction is based upon contract. As to whether or not the payment of an acknowledged debt constitutes a valid consideration upon which to support a contract satisfying a disputed claim is not, in the light of our above stated conclusions, necessary for us to herein decide.

Concluding as we do that there is no evidence upon which a reasonable inference can be drawn to the effect that death of insured was the result of an accident, to-wit, "a fall causing a brain condition and acute cerebral edema and death," there is but one course for us to follow.

Judgment reversed. All concur.